## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Securities and Exchange Commission,      *

v.                  *      Civil Action No. CCB-17-3230

Phillip R. Jacoby, Jr.,        *

                       *
                  ***

### Memorandum

The SEC has filed a complaint alleging that in 2014 and 2015 Lode B. Debrabandere, among others, participated in a fraud to artificially raise the revenue of Osiris Therapeutics, Inc. As a result, Debrabandere allegedly violated, or aided and abetted violations of, several anti-fraud provisions, and reporting and accounting requirements of the Securities and Exchange Acts. The SEC also alleges that Debrabandere violated the Sarbanes-Oxley Act by failing to reimburse Osiris for salary and bonuses he received as a result of his fraud. Debrabandere has moved to dismiss the SEC's amended complaint under Rule 12(b)(6). For the reasons stated below, his motion will be denied.[1]

### Background

During all of 2014, and the first three quarters of 2015, Lode B. Debrabandere, Chief Executive Officer of Osiris Therapeutics, Inc.,[2] a biotechnology company, allegedly participated in fraud. (Am. Compl., ECF No. 38, at ¶¶ 1, 18). And he did so by improperly claiming revenue Osiris did not, or was not guaranteed to, receive. Here is how.

---

[1] The SEC also named as individual defendants Philip R. Jacoby, Jr., Gregory I. Law, and Bobby Dwayne Montgomery. They have not filed motions to dismiss.
[2] Osiris Therapeutics, Inc. settled out of the case in November 2017. (ECF No. 4).

A.

Osiris sells its products in two ways: (1) it sells directly to consumers or distributors, through an in-house sales team; and (2) it sells through third-party distributors. (*Id.* at ¶ 20). When selling through a distributor, Osiris consigns its products, taking payment only when the distributor sells the product to an end-user or when the product is used in a surgical procedure. (*Id.* at ¶ 22). To account for its sales, through either of these means, in quarterly and annual filings with the SEC and in representations to auditors, Osiris is required to follow Generally Accepted Accounting Principles (GAAP): the company could account revenue when it was realized, realizable, or earned, which occurs when "(1) title and the risk of loss passes to the customer; (2) persuasive evidence of an arrangement exists; (3) sales amounts are fixed or determinable; and (4) collectability is reasonably assured." (*Id.* at ¶¶ 23-24). The complaint alleges that Debrabandere knew Osiris failed to abide by these accounting requirements, either as a result of his own conduct or the conduct of others, but nonetheless represented to auditors, investors, and the SEC that the company was fully compliant with respect to transactions with four distributors: Distributor A, Distributor B, Distributor C, and Distributor D.

B.

The first instance of Debrabandere's alleged misconduct is a cover-up. To reach a revenue goal set by Debrabandere in the fourth quarter of 2014, two co-defendants set out to convert consigned product in Distributor A's inventory to completed sales. (*Id.* at ¶¶ 36-39). They were successful—Distributor A agreed to buy $1.1 million worth of product with payments spread over a year—but the agreement was not reached until January 2015. Nevertheless, Osiris's books improperly recorded that sale as taking place on December 31, 2014, nearly a month before it actually occurred. (*Id.* at ¶¶ 40-43).

Auditors requested information about this transaction in November 2015, which prompted Debrabandere allegedly to order a co-defendant to find documentation that would make the recorded revenue appear lawful. (*Id.* at ¶ 58). The co-defendant complied and sent Distributor A an email:

> [A]ttached is something that I think you should find and send to me in an email saying you had this in your file from late last year and just came across it – and that it does memorialize our several phone conversations . . . call me if necessary, but write a wonderfully warm and convincing email, please – send it to my Osiris email

(*Id.*). The CEO of Distributor A replied with the requested back-dated letter, which was then forwarded to Debrabandere. (*Id.* at ¶ 60). The company then used this letter to convince its auditor that the revenue it recorded from Distributor A complied with GAAP. (*Id.*).

## C.

More than just a participant in a cover-up, Debrabandere also allegedly directed fraudulent activity. Against a rush to meet a revenue target, Debrabandere was presented with a problem on March 27, 2015: Distributor B wanted Cartiform, one of Osiris's products, but the company did not have enough Cartiform to fill an order. (*Id.* at ¶¶ 64-65). Debrabandere devised a plan. The company would ship Distributor B "[G]rafix and later swap to [C]artiform when we have it," and it "would be great" if Distributor B could make a partial payment on the order. (*Id.* at ¶ 65). On March 31, 2015, the last day of the first quarter of 2015, Distributor B agreed to pay Osiris $100,000 by the end of the day for Cartiform—not the Grafix Osiris planned to ship—and to purchase $650,000 of Cartiform or Grafix by December 31, 2015. (*Id.* at ¶¶ 66-67). Osiris's ability to ship products to Distributor B, however, was conditioned on Distributor B obtaining certain "licenses, certificates, and permits." (*Id.* at ¶ 67). Thus, Debrabandere could not be sure

the company would sell anything to Distributor B, and knew that Distributor B paid for products it did not order.

Osiris recorded $750,000 in revenue from Distributor B for the first quarter of 2015 notwithstanding that it only had received $100,000 conditioned on the shipment of a product Osiris did not, and could not, ship. (*Id.* at ¶¶ 69-70). Debrabandere represented that Osiris really did receive $750,000 in revenue from Distributor B anyway, confirming for the company's auditors that: (1) the company's financial statements were prepared in accordance with GAAP; (2) the financial statement did not omit material transactions; and (3) that Debrabandere did not know of "any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements." (*Id.* at ¶ 76).

### D.

Debrabandere similarly is alleged to have manipulated transactions with Distributor C to meet revenue goals during the first, second, and third quarters of 2015. Under its agreement with Osiris, Distributor C was "the exclusive marketer and promoter of BIO," one of Osiris's products. (*Id.* at ¶¶ 91, 93). Osiris would ship product to Distributor C on consignment: Distributor C would hold the inventory, but Osiris could not register sales until the inventory was sold to an end-user. (*Id.* at ¶ 109). When customers purchased BIO from Distributor C, Distributor C would then transfer the payment, less its commission, to Osiris. (*Id.* at ¶ 93).

Despite this arrangement, Debrabandere urged employees to register some consignment inventory as sales, stating that "[w]e cannot wait until we receive [purchase orders] to book these as a sale . . . . Goal is to get to $1 million" in BIO sold this quarter. (*Id.* at ¶ 110). His employees

listened. (*Id.* at ¶ 113). Like its transactions with Distributor B, Debrabandere then misrepresented Osiris's business with Distributor C to auditors. (*Id.* at ¶¶ 123-24).

E.

Finally, Debrabandere allegedly participated in the fraudulent accounting of Osiris's business with Distributor D. Distributor D received product from Distributor E, a commissioned distributor of Osiris's products Ovation and Grafix, during 2014 and the first three quarters of 2015. (*Id.* at ¶ 129). As part of this arrangement, Distributor D was to make payment on the Osiris products it purchased within 30 days, but Osiris allowed Distributor D to withhold payment until after the product was sold to an end-user, which often occurred much later than 30 days after it purchased the Osiris product. (*Id.* at ¶¶ 130-31). Debrabandere allegedly knew about, and agreed to, this practice. (*Id.* at ¶ 131). Despite outstanding payments as a result of Distributor D's late payments—in January 2015, Osiris employees acknowledged that Distributor D owed the company $7 million, (*id.* at ¶ 132)—Osiris recognized $14 million in revenue from Distributor D during 2014, and $4 million during the first three quarters of 2015, in violation of GAAP, (*id.* at ¶ 135). Eventually, Distributor E notified Osiris that it was taking over Distributor D's account in an email that was forwarded to Debrabandere. (*Id.* at ¶ 134).

Debrabandere then misrepresented the company's sales with Distributor D by failing to disclose that Distributor D's account was deficient, or that Distributor E took over Distributor D's payments, (*id.* at ¶ 146). Indeed, he represented the opposite: (1) the company's financial statements were prepared in accordance with GAAP; (2) the financial statement did not omit material transactions; and (3) that he did not know of "any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements." (*Id.* at ¶¶ 140-42, 146).

5

## G.

Because these fraudulent transactions artificially raised Osiris's revenue, Debrabandere also allegedly made materially false and misleading statements to investors regarding Osiris's finances during 2014 and the first three quarters of 2015, and participated in false filings to the SEC during the first three quarters of 2015. (*Id.* at ¶ 148).

### I.   First Quarter of 2014

- Debrabandere stated on an earnings call that he was "pleased with the quarter-over-quarter growth rate of 25%, or revenue of $10 million." (*Id.* at ¶ 149).
- As CEO, "Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's" Form 10-Q and Form 8-K filings, which contained misstatements during the first quarter of 2014. (*Id.* at ¶ 150).

### II.   Second Quarter of 2014

- On an earnings call, Debrabandere claimed Osiris "continued to experience very healthy growth and reported sales of $13.3 million." (*Id.* at ¶ 151).
- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributor D. Its form 8-K similarly contained errors. (*Id.*)

### III.   Third Quarter of 2014

- Debrabandere touted "another record quarter for Osiris" to investors and stated the company continues "to experience very healthy growth and reported sales of $17.2 million for the quarter."(*Id.* at ¶ 153).
- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributor D. Its form 8-K similarly contained errors. (*Id.*)

### IV.   Fourth Quarter of 2014

- Debrabandere misstated Osiris's revenue on an earnings call, claiming "from a revenue perspective, Osiris grew 146% year-over-year from $24 million in 2013 to about $60 million in 2014." (*Id.* at ¶ 155). He also stated that the company's fourth quarter revenue was $19.3 million. (*Id.*)

- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributor A and D. Its form 8-K similarly contained errors. (*Id.*)

## V.     First Quarter of 2015
- On an earning's call, Debrabandere explained "that Osiris ended the first quarter with $21 million in revenue, more than double the revenue of $10 million in the first quarter of last year." (*Id.* at ¶ 157).
- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributors A, B, C, and D. Its form 8-K similarly contained errors. (*Id.*)

## VI.    Second Quarter of 2015
- On this quarter's earnings call, Debrabandere reported $23.7 million in earnings. (*Id.* at ¶ 159).
- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributors A, B, C, and D. Its form 8-K similarly contained errors. (*Id.*)

## VII.   Third Quarter of 2015
- Debrabandere reported $24.3 million in earnings on an earnings call. (*Id.* at ¶ 161).
- Osiris's Form 10-Q contained misstatements because of the company's transactions with Distributors C and D. Its form 8-K similarly contained errors. (*Id.*)

***

In sum, Debrabandere: (1) directed or knew about a false document produced to cover-up fraudulently recorded revenue from Distributor A; (2) directed Osiris to recognize a sale of a product Distributor B did not order during the first quarter of 2015; (3) directed Osiris to treat Distributor C's consigned product as sales; (4) failed to tell the auditor that it would not pursue payment from Distributor D until it sold product to end-users; (5) failed to tell the auditor that Distributor E took over Distributor D's payments; (6) failed to tell the auditors, board of directors, or investors about any of the company's improper accounting; and (7) signed letters and forms misrepresenting the financial condition of the company. (*Id.* at ¶ 171). And as a result

7

of this alleged misconduct, Debrabandere received a salary increase and bonus in 2015. (*Id.* at ¶ 177).

On November 2, 2017, the SEC filed suit against Debrabandere, and his co-defendants, claiming that he violated several provisions of the Securities and Exchange Acts. (ECF No. 1). Debrabandere now moves for dismissal claiming that the SEC has failed to state a claim under Federal Rule of Civil Procedure 8. (ECF No. 17).[3]

### Standard of Review

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). And the plaintiff typically must do so by relying solely on facts asserted within the four corners of his complaint. *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015). When alleging fraud, however, "a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

---

[3] The defendant also has moved to seal Exhibit A to its supplemental memorandum because it contains names of non-defendants and distributors. (ECF No. 33). Because even the SEC refers to the distributors through pseudonyms and has not opposed the motion, the court will seal the exhibit.

## Analysis

Debrabandere takes no issue with the SEC's allegations that Osiris committed fraud by improperly inflating its revenue and reporting that revenue to investors and the SEC. Rather, and over again, Debrabandere insists he never participated in the fraudulent conduct, or at least lacked the necessary state of mind to violate the Securities and Exchange Acts. But the seventy-three page complaint, taken as true and supported by specific factual allegations, tells a different story, one in which Debrabandere not only plausibly knew of the fraudulent scheme, but acted as its principal conductor.

## I.

Debrabandere first claims that the SEC has failed to state a claim under Rule 10b-5 of the Exchange Act. The Rule makes it:[4]

> unlawful for any person, directly or indirectly . . . (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security

17 C.F.R. 240.10b-5(a)-(c); *see also* 15 U.S.C. § 78j(b) (empowering the SEC to promulgate this rule). To state a claim under this rule a plaintiff must show "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Dura Pharm., Inc. v.*

---

[4] The SEC also pursues suit against Debrabandere under section 17(a) of the Securities Act which makes it "unlawful for any person in the offer or sale of any securities . . . [to] directly or indirectly (1) . . . employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact . . . or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). Because section 17(a) is substantially similar to Rule 10b-5 the court will follow the parties' lead and treat these two claims as one. Thus, for the reasons stated below the SEC's claim under 15 U.S.C. § 77q(a) also survives Debrabandere's motion to dismiss.

*Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted). A defendant has scienter if his conduct was intentional or reckless—"so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Maguire Financial, LP v. PowerSecure International, Inc.*, 876 F.3d 541, 546-47 (4th Cir. 2017).

Debrabandere claims the complaint is twice deficient on this claim: it neither sufficiently alleges that he was connected to Osiris's accounting violations or that he had the required scienter even if he were connected.[5] But the complaint—through detailed factual allegations—describes Debrabandere's tenure as CEO differently, one marked by intentional, or at least reckless, involvement in a scheme to artificially raise revenue that was then reported to investors, auditors, and the SEC.

## A.

Take Osiris's transactions with Distributor B first. In a bid to raise revenue, Debrabandere represented that Osiris earned $750,000 from Distributor B during the first quarter of 2015. But the companies reached no such deal. Distributor B made a partial payment of $100,000 to Osiris on the last day of the quarter, but that money was conditioned on the Distributor receiving Cartiform—a drug Osiris could not send in sufficient quantity and so Grafix, a drug Distributor B did not order, was sent in its place. As for the remaining $650,000 Osiris recorded as revenue, Distributor B had nine months to make that payment and it was conditioned on the Distributor obtaining licenses to receive shipment of the product. In other words, Debrabandere had Osiris record profit derived from unordered product and unguaranteed future sales.

---

[5] Because the court finds that the SEC has sufficiently stated a claim under Rule 10b-5 and Section 17(a), it does not reach the SEC's alternative claims found in Counts II, III, and V.

Debrabandere does not dispute that Osiris's recording of this transaction was improper, or that the company misrepresented its revenue in filings with the SEC as a result of it, but instead insists the complaint mischaracterizes the email he sent instigating Osiris's improper behavior, and when read in context, the email shows that he is unconnected from the company's unlawful accounting. Debrabandere argues his email was a reply: An employee sent him an earlier email stating that the employee was "awaiting a call from the [CFO] to see if we can book the complete revenue as long as I have a [purchase order] and $250K cash . . . . I am confident [the CFO] will be okay with this." (ECF No. 17, Ex. A).[6] Debrabandere argues that this email shows that his response was conditioned on final approval from the company's CFO.

The email shows no such thing: Debrabandere's email never even mentions the CFO, or so much as hints that his instruction is contingent on external approval. But even if Debrabandere did seek approval, that alone does nothing to undermine the SEC's claim. That Debrabandere sought CFO approval does not suggest that Debrabandere did not know his proposed manner of recording the company's transaction with Distributor B was unlawful or that he wanted to be sure of its lawfulness before proceeding. In fact, the sheer transparency of the company's improper accounting of its transaction with the Distributor suggests the opposite: Debrabandere urged his employees to sell a distributor a product it did not want and recorded profits from a sale that did not, and might not ever, occur. And all of this was done with the express intention of reaching a revenue goal. Debrabandere's role as CEO only makes it all the more plausible that he understood that this accounting was wrong, and knew he was representing to auditors, investors, and the SEC fraudulently inflated revenue. On that view, a view that takes all inferences in favor of the plaintiff as the court must do on a motion to dismiss, any approval Debrabandere sought

---

[6] Documents integral to the complaint may be considered on a motion to dismiss. *Goines v. Valley Community Services Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

from his CFO is more plausibly an effort to ensure his CFO approved of Debrabandere's plan irrespective of its lawfulness,[7] rather than an effort to ensure the accuracy of the company's accounting.

Falling back, Debrabandere claims the company's transaction with Distributor B also cannot support a claim because he was not personally involved with execution of the agreement with Distributor B, the shipment of the product, or the recording of the revenue. But the regulation contemplates liability for those who "indirectly . . . make any untrue statement of a material fact or . . . omit to state a material fact" or who "engaged in any act, practice, or course of business which operates or would operate as a fraud." 17 C.F.R. 240.10b-5(b), (c). There is no doubt that Debrabandere instructed his employees to sell a distributor unwanted goods to inflate revenue. That he did not personally record the revenue does nothing to alter the fact that he indirectly ensured that whatever was recorded would be improper, that he knew the recording was improper, and that he nonetheless represented to investors, auditors, and the SEC that Osiris's books were perfectly proper.

Finally, Debrabandere claims that even if he is connected to the fraudulent scheme the SEC still fails to state a claim because the complaint does not sufficiently allege that his conduct was intentional or reckless. And that is so because the complaint fails to allege that he has the accounting background necessary to understand that he was violating the GAAP and because he never made any stock sales during the fraud—an indicator of scienter.[8] But what the complaint lacks in allegations concerning Debrabandere's accounting-know-how it makes up for in

---

[7] This view is supported by considerable allegations that Osiris's CFO also was engaged in fraud. (*See generally* ECF No. 38).

[8] Debrabandere asserts several other arguments explaining why he did not have the required scienter to commit a violation under the regulation. (ECF No. 17 at pp. 23-26). Because they are irrelevant to the court's grounds for reaching the opposite conclusion there is no reason to describe them all.

common sense inferences drawn from a detailed and well-supported explanation of Debrabandere's role in Osiris's fraud.

The scheme speaks for itself: Once more, Debrabandere instructed his employees to send a distributor product it did not order. And the only plausible reason he would want his company to do so—to risk its relationship with a business partner—was that he knew the company could claim revenue as a result of that conduct it otherwise could not. Debrabandere's coordinating email came only a few days before the end of the first quarter of 2015, leaving little doubt that raising the company's revenue was his goal, and in that very email Debrabandere also recognized that Osiris would eventually have to give the distributor the product it did in fact want, expressly recognizing that the company was not acting properly. And if there were any doubt left about Debrabandere's scienter, recall that he was the CEO of the company and therefore could be expected to understand basic accounting principles. At the motion to dismiss stage this is more than sufficient to plausibly allege that Debrabandere's conduct was either intentional or reckless as to the company's transaction with Distributor B.

B.

Debrabandere's conduct as to the company's transactions with Distributor C is of a piece. Here, as there, Debrabandere sent an email—this time telling an employee that "[w]e cannot wait until we receive [purchase orders] to book these as a sale"—and here, as there, his instruction was improper. Some of the shipments of product to Distributor C Debrabandere wanted recorded as sales were sent on consignment and thus could not be recorded as a sale until they were purchased by an end-user.

And here, as there, Debrabandere claims context matters: the email he sent stated "[w]e discussed last week to consider shipments to [Distributor C] customers as 'a sale.' It might

13

include some consignment at [Distributor C's] level, but not at ours." (ECF No. 17, Ex. C).

Debrabandere argues that this sentence suggests "he did not believe that Osiris's shipments to

Distributor C were consignment sales . . . and, accordingly, he could not have believed that

Osiris was recognizing revenue on consigned product in violation of GAAP." (ECF No. 17 at

23). But that cannot be right, as it would render the very next sentence—"[w]e cannot wait until

we receive [purchase orders] to book these as a sale—and the email's first sentence—"[c]an you

guys figure out what the shipments to [Distributor C] are and account for those as 'sales'"—

meaningless. If Debrabandere thought Osiris's shipments to Distributor C were true sales then

Osiris did not need purchase orders to record them as such and Debrabandere would not have

had to instruct his employees as he did. Indeed, he would have no reason to state the "[g]oal is to

get to $1 million" in sales of a certain drugs if he did not think his email would affect the

company's chances of reaching that number—something that would be impossible if the

shipments were sales all along. But perhaps most damning is that Debrabandere's own employee

understood his email as the SEC does: "Lode, I do need to get case sheets from [Distributor C] in

order to put those through as revenue. The orders that went as sales at the time of shipment have

been recorded." (ECF No. 17, Ex. C). Context, therefore, cuts against dismissal.

Grasping at straws, Debrabandere also claims the sentence omitted from the SEC's

papers uses the word "we" and thus implies that treating the shipments as sales was an idea

developed by others. This argument is frivolous: "We" is an inclusive pronoun, and in that

sentence included Debrabandere in whatever prior discussions were had. Last, he claims again

that merely sending an email is insufficient to support a claim under 17 C.F.R. 240.10b-5.

Because the statute contemplates liability for indirect conduct, this argument must fail.

Finally, all of this, as it does with Distributor B, supports that Debrabandere acted with scienter. Debrabandere made his intention plain: The company could not wait for its consigned product to be purchased and so recorded assignments as sales. Considering this, and Debrabandere's knowledge as CEO, the court finds that the complaint plausibly asserts that Debrabandere intended to commit fraud. Again, the SEC has carried its burden under Rules 8 and 9.

C.

Last, Debrabandere claims that the SEC's claim as to Distributor D should be dismissed because the complaint fails to allege with particularity that he knew the Distributor was submitting payments beyond the parties' 30-day agreement or that Debrabandere controlled how Osiris accounted for Distributor E taking over Distributor D's account.

Debrabandere is only half right. As he claims, the complaint fails to allege with specificity how Debrabandere knew Distributor D was not making timely payments, a flaw that stands in an otherwise well-pled complaint. But dismissal is still not appropriate because the complaint sufficiently alleges that Debrabandere knew Distributor E took over Distributor D's accounts but failed to report that information as was required under Rule 10b-5. 17 C.F.R. 240.10b-5(a)-(c) (making it unlawful to make an "untrue statement of a material fact" or to "omit . . . a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"). It is undisputed that Debrabandere was forwarded an email explaining that Distributor E was assuming Distributor D's payments and he nevertheless signed representations to auditors, investors, and the SEC knowing that they did not accurately describe that new relationship. For that reason, the SEC's claim survives Debrabandere's motion.

15

II.

Next, Debrabandere urges the court to dismiss the SEC's claim that he deceived Osiris's

auditors under 17 C.F.R. 240.13b2-2. Under Rule 13b2-2 of the Exchange Act, it is unlawful for

a director or officer to:

> directly or indirectly: (1) [m]ake or cause to be made a materially false or
> misleading statement to an accountant in connection with; or (2) [o]mit to state, or
> cause another person to omit to state, any material fact necessary in order to make
> statements made, in light of the circumstances under which such statements were
> made, not misleading, to an accountant in connection with: (i) [a]ny audit, review
> or examination of the financial statements of the issuer required to be made
> pursuant to this subpart; or (ii) [t]he preparation or filing of any document or
> report required to be filed with the Commission pursuant to this subpart or
> otherwise.

17 C.F.R. 240.13b2-2(a)(1), (2)(i), (2)(ii).

Debrabandere argues that the complaint does not allege that he "had any interactions with

the Auditor whatsoever." (ECF No. 17 at p. 29). Repeatedly the complaint alleges the opposite.

Debrabandere "signed the management representation letter to the Auditor" for every quarter

relevant to this suit. (Am. Compl. at ¶¶ 76, 123, 140-42, 171, 179). And in those letters

Debrabandere represented that: (1) the company's financial statements complied with GAAP; (2)

there were no material omissions from the financial statements; and (3) that he "had no

knowledge of any fraud or suspected fraud involving management, employees who have

significant roles in internal control, or which could have a material effect on the financial

statements." (*Id.*)

As stated above, Debrabandere knew, often by his own conduct, that each one of those

representations was false. The company's revenue during the relevant period was artificially

inflated by a Debrabandere-led effort to recognize revenue from Distributors B and C that the

company had not or would never receive; information that Distributor E had taken over

Distributor D's payments to the company was withheld; and Debrabandere knew of but did not report inflated sales figures from its transactions with Distributor A. The SEC has stated a claim under 17 C.F.R. § 240.13b2-2, as well.

### III.

Debrabandere also argues that the SEC's claims that he falsified accounting records under 17 C.F.R. § 240.13b2-1, falsified certifications of Forms 10-Q and 10-K under 17 C.F.R. § 240.13a-14, and failed to implement internal accounting controls under 15 U.S.C. § 78m(b)(5) should be dismissed. Substantially for the reasons already stated, these claims survive the motion.

### A.

Rule 13b2-1 of the Exchange Act makes it unlawful for any person to "directly or indirectly, falsify or cause to be falsified, any book, record, or account." 17 C.F.R. § 240.13b2-1. Debrabandere insists the complaint fails to sufficiently allege that revenue was ever improperly recognized as a result of his conduct. That is not correct.

For one thing, Debrabandere does not dispute that Osiris records or accounts were falsified, and for good reason; the complaint in persuasive detail describes how the company submitted false reports and earnings statements over seven quarters. (Am. Comp. at ¶¶ 149-61). For another, the complaint plausibly shows that Debrabandere participated in conduct, as explained above, that led directly (or indirectly) to the false record and accounts the company submitted. Far from "no well-pled allegations" that Debrabandere's conduct led to violations of Rule 13b2-1, the complaint over again explains, with documentary allegations, his effort to artificially inflate the company's revenue to meet certain sales goals and failure to report efforts by others to do the same. The SEC again has stated its claim.

17

Relatedly, Debrabandere also challenges the SEC's claim that he violated 15 U.S.C. § 78m(b)(5) which makes it unlawful for any person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls." For the reasons stated above, the SEC has alleged sufficient facts to support a claim that Debrabandere knowingly circumvented or knowingly failed to implement a system of internal accounting controls.

### B.

Rule 13a-14 of the Exchange Act requires a CEO to certify the accuracy of a company's quarterly and annual reports under the Sarbanes-Oxley Act. Specifically, the CEO must certify that based on his knowledge "the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report." 15 U.S.C. § 7241(a)(2)-(3).

Debrabandere argues that the SEC fails to state a claim under Rule 13a-14 because it does not allege with specificity that he knew Osiris's Form 10-Q and Form 10-K submissions during 2014 and the first three quarters of 2015 contained false statements or omitted material information. For the reason already stated, the complaint sufficiently alleges the opposite. This claim too survives.

### IV.

Next Debrabandere challenges the SEC's claims that he aided and abetted Osiris's violation of: (1) Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13; and (2) Section 13(b)(2) of the Exchange Act. The Exchange Act has it that in any action brought by the SEC "any person that knowingly or recklessly provides substantial assistance to another

person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e); *see also* 15 U.S.C. § 77o(b) (doing the same for the Securities Act); *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 152 (2011) (defining "civil law aiding and abetting as know[ing] that the other's conduct constitutes a breach of duty and giving substantial assistance or encouragement to the other") (emphasis and citation omitted).[9]

## A.

Under 15 U.S.C. § 78m(a) an issuer of securities must file with the SEC "(1) such information and documents . . . as the Commission shall require" and "(2) such annual reports . . . certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports . . . as the Commission may prescribe." The SEC has promulgated several regulations to enforce this rule: (1) an issuer must add to any required filing "such further material information . . . as may be necessary to make the required statements . . . not misleading," 17 C.F.R. 240.12b-20; (2) an issuer "shall file an annual report . . . for each fiscal year," 17 C.F.R. 240.13a-1, in a Form 8-K, 17 C.F.R. § 240.13a-11; and (3) an issuer shall "file a quarterly report on Form 10-Q," 17 C.F.R. 240.13a-13.

The SEC claims Osiris violated these rules by submitting false and misleading documents. Debrabandere does not deny that Osiris is liable as the SEC claims but rather insists that the SEC has failed to allege that "he provided substantial assistance with respect to any alleged primary violation." (ECF No. 17 at pp. 27-28 n.15). But Debrabandere signed or certified

---

[9] Because the court finds that the SEC has sufficiently stated a claim that Debrabandere aided and abetted Osiris's violations of 15 U.S.C. § 78m(a) and accompanying regulations, and 15 U.S.C. § 78m(b)(2)(A)-(B)(ii), the court does not reach the SEC's claims in the alternative (Counts XI and XIV) that Debrabandere was a control person under 15 U.S.C. § 78t(a).

the very documents at the core of Osiris's violations. Indeed, but for Debrabandere's conduct, Osiris's violation may not have occurred. No doubt, the SEC has stated a claim under 15 U.S.C. § 78m(a) and accompanying regulations.

B.

Section 78m(b)(2) requires every issuer to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transaction and dispositions of the assets of the issuer" and "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that ... transactions are recorded ... in conformity with generally accepted accounting principles." 15 U.S.C. § 78m(b)(2)(A)-(B)(ii).

Again, Debrabandere claims the complaint has not alleged that he substantially assisted Osiris's violation of this provision. For substantially the same reasons as those stated in Section IV.A., the SEC has stated a claim that Debrabandere aided and abetted Osiris's violation of Section 78m(b)(2).

V.

Last, Debrabandere challenges the SEC's claim that he violated section 304(a) of the Sarbanes-Oxley Act. Section 304(a) demands that if a CEO must "prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws [she] ... shall reimburse the issuer for (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing" containing the required accounting restatement; "and (2) any profits realized from the sale of securities of the issuer during that 12-month period." 15 U.S.C. § 7243(a)(1)-(2).

Debrabandere does not dispute that the company was required to issue a restatement due to noncompliance. Instead he argues that the plaintiff's Section 304(a) claim should be dismissed

20

because the complaint does not sufficiently allege that he "received compensation or profits subject" to the law. (ECF No. 17 at p. 33). Not true—the complaint specifically alleges that "Debrabandere obtained salary and bonus from Osiris and, upon information and belief, his 2015 salary increase and bonus were influenced by Osiris's 2014 financial metrics, including revenue." (Am. Compl. at ¶ 177). No doubt, the plaintiff's allegation is unsupported by documentary evidence, but it is supported by the reasonable inference that as CEO Debrabandere plausibly received a bonus during the relevant period, and either an incentive- or equity–based salary. On a motion to dismiss that is sufficient. *See Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (recognizing that a complaint is plausible on its face if it allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Accordingly, Debrabandere's motion will be denied as to this claim as well.

## Conclusion

For the reasons stated above, Debrabandere's motion to dismiss will be denied. A separate order follows.

8/3/18
Date

Catherine C. Blake
United States District Judge

21