**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | * | |
| COMMISSION | * | |
| | * | Civil Action No. CCB-17-3230 |
| v. | * | |
| | * | |
| PHILIP R. JACOBY, JR., *et al*. | * | |
| | * | |
| | * | |
| | ***** | |

## MEMORANDUM

This civil enforcement action brought by the Securities and Exchange Commission (the "SEC") concerns the purportedly fraudulent activities of two executives formerly employed by Osiris Therapeutics, Inc. ("Osiris").[1]  Lode B. Debrabandere, Osiris's former Chief Executive Officer, and Philip R. Jacoby, Jr., Osiris's former Chief Financial Officer, are accused of engaging in fraudulent conduct to artificially inflate Osiris's revenue beyond what Generally Accepted Accounting Principles ("GAAP") permit.  The SEC alleges that these actions violated some of the anti-fraud provisions and the reporting and accounting requirements of the Securities and Exchange Acts, and that the defendants' failure to reimburse Osiris for payments received as a result of the purported fraud violated the Sarbanes-Oxley Act.[2]  Before the court is the SEC's motion for partial summary judgment against Debrabandere (ECF 153) and its motion for partial summary judgment against Jacoby (ECF 151).  The matter has been fully briefed and oral argument was heard on December 14, 2020.  For the reasons described herein, the motion against Debrabandere will be granted in part and denied in part and the motion against Jacoby will be granted in part and denied in part.

---

[1] The SEC's complaint also named Osiris and two other former Osiris employees, Gregory Law and Dwayne Montgomery. Osiris paid a $1.5 million civil penalty in relation to its conduct on November 6, 2017.  (ECF 4).  Law was dismissed from the action by stipulation on September 24, 2019.  (ECF 112).  Montgomery had judgment entered against him on October 8, 2019, and a civil penalty of $40,000 resulted.  (ECF 119).

[2] The SEC has moved for summary judgment on the issue of liability only and reserves for future proceedings the issue of remedies, though the complaint generally seeks permanent injunctions, officer and director bans, disgorgement of profits, civil penalties, and reimbursement of bonuses and incentive-based compensation.  (*See* ECF 38, Am. Compl. ¶ 12).

## FACTS

Osiris, a biotechnology company based in Columbia, Maryland, manufactures products for orthopedics, sports medicine, and wound care, and sells some of its products via third-party distributors.  (ECF 47, Jacoby Ans. ¶ 1).  As a publicly traded company, Osiris was required to publicly file quarterly and annual reports with the SEC.  (ECF 57, Debrabandere Ans. ¶ 23).  The purported fraud relevant to the pending motions for partial summary judgment center around improperly recorded revenue from the fourth quarter of 2014 and the first, second, and third quarters of 2015 which Osiris attributed to four third-party distributors of its products: PhysioRx, Medikon, Stryker, and Stability.

Philip Jacoby, at the relevant time the company's Chief Financial Officer ("CFO"), has pled guilty to falsely backdating a document memorializing a PhysioRx transaction that did not occur on that date, and was allegedly involved in recognizing revenue from a shipment of products to Medikon which Medikon never placed and in recording revenue from Stryker at an inflated list price rather than the actual sales price.  Lode Debrabandere, at the relevant time the company's Chief Executive Officer ("CEO"), was allegedly involved in the same Medikon transaction, in addition to a scheme that supposedly allowed Osiris to claim revenue from the consignment of products to Stability despite a purported side agreement allowing Stability to only pay for what it ultimately sold to third parties.  The relevant transactions are described in more detail below.

### I.      PhysioRx

PhysioRx was a distributor of Osiris products in 2014 and 2015.  (ECF 47, Jacoby Ans. ¶¶ 7,

32).  At the end of fiscal year 2014, Jacoby signed and certified a Form 10-K in which Osiris

recognized $1.1 million in revenue from a purported December 31, 2014, transaction with PhysioRx.

(*Id.*).  When asked by Osiris's auditors for documentation supporting this transaction, Debrabandere

asked Jacoby to locate supporting documentation.  (ECF 47 ¶ 58; ECF 57, Debrabandere Ans. ¶ 58).

In November 2015, to satisfy the auditors' request, Jacoby created and falsely backdated a letter

purporting to memorialize a December 29, 2014, transaction accounting for the $1.1 million in revenue

recorded in 2014.  (ECF 47 ¶¶ 34, 193).

Jacoby attached this backdated letter to an email sent from his personal email account to

PhysioRx's CEO, Denise Mason, telling her: "[A]ttached is something that I think you should find and

send to me in an email saying you had this in your file from late last year, and just came across it – and

that it does memorialize our several phone conversations."  (*Id.* ¶ 84; ECF 152-19, Ex. 455).  The

email continued: "Call me if necessary, but write a wonderfully warm and convincing email, please –

send it to my Osiris email."  (ECF 152-19, Ex. 455).  Mason followed Jacoby's instructions, sending

him an email in which she purported to find the letter.  (ECF 152-20, Ex. 456).  Jacoby then caused the

message to be sent to Osiris's auditors, knowing it would mislead the auditors.  (ECF 152-6, Ex. 12;

ECF 47 ¶ 61).

Jacoby later signed the filing restating the $1.1 million in revenue from this transaction—

described in the filing as a material misstatement—in the third quarter of 2015.  (ECF 152-2, Ex. 1).  A

restatement, according to Osiris's current CFO Joel Rogers, necessarily corrects "material errors,"

(ECF 152-3, Ex. 2 at 3), and by its own terms the restatement noted that "[t]he evidence suggests that

an arrangement with the distributor did not exist in 2014 so that the criteria required under GAAP to

recognize revenue for this transaction in 2014 was not met[,]" (ECF 152-3, Ex. 2 at 3; *see also* ECF

152-41, Ex. 619, Rogers Dep. at 41).

Jacoby ultimately pled guilty to violating Rule 13b2-2 of the Exchange Act, which prohibits

making false or misleading statements to auditors, on the basis of this conduct.  (ECF 152-22, Ex. 601;

ECF 152-24, Ex. 603).  His plea colloquy included the following exchanges:

THE COURT:    Let's make sure you understand what you are charged with in this information. It concerns false statements to auditors. It concerns the period . . . between October and November of 2015. . . . It charges that you were an officer in the issuer of publicly traded securities, and while holding that position you knowingly and willfully made or caused to be made materially false statements to an accountant or you omitted to state material facts to the accountant that were necessary in order to make other statements true, all in light of the circumstances under which such statements were made to make sure that they were not misleading. It charges further that this knowing and willful misconduct occurred in connection with an audit, a review, or examination of the financial statements of the issuer that were required to be filed by law with the SEC. This is specifically referring to you fabricating a backdated letter purporting to document revenue from a distributor, and you caused that letter to be provided to the auditors in connection with their audit of Osiris . . . . Specifically, it is 2014 10-K and third quarter 2015 10-Q. Do you understand that is the charge against you?

JACOBY:    Yes, I do, your Honor.

***

THE COURT:    Please tell me in your own words what you did that makes you believe you are guilty of the crime charged.

JACOBY:    I worked at Osiris . . . and served as the CFO starting in 2008. . . . I arranged to sell [PhysioRx] roughly 1.1 million of a product known as Ovation. We booked the revenue from the sale in Q4 2014 even though we did not have the terms of the sale memorialized in any document. The terms and conditions of the sale were verbally agreed to by all the parties, but written documentation was not obtained prior to fiscal year end. Later in November 2015, Osiris's auditor, BDO, questioned the accounting for the transaction during review of their work by the PCAOB. BDO had previously issued their audit opinion on Osiris's 2014 financial statements, which included this transaction. BDO sought documentation to support the recognition of this revenue in 2014. . . . [T]he Osiris CEO called and asked if I could provide a writing that would satisfy BDO. I understood that BDO was looking for documentation from 2014 and that no such documentation existed. Despite that, I drafted a memo on November 5, 2015, that purported to reflect the terms of the agreement with PhysioRx. I dated the memorandum December 29, 2014, which was false. I sent it from my personal email to PhysioRx and asked them to send it back to me in my work email to make it look like PhysioRx had it in their files as a document created in 2014 when actually it

4

was not. PhysioRx sent the document back to me, and on November 5, 2015, I provided it to Osiris in Maryland so it could be given to BDO. I knew it was wrong when I did it and I deeply regret having done so.

THE COURT:     Did you understand that it was a violation of the law to backdate that document and get it provided to the auditors?

JACOBY:     Yes, your Honor, I did.

(ECF 152-23, Ex. 602, Plea Colloquy, at 9–10, 14–16).

## II.     Medikon

Medikon was a Turkish company which, in early 2015, was negotiating a distribution and supply agreement with Osiris for the consignment of two of Osiris's products: Cartiform and Grafix. (ECF 47 ¶¶ 8, 63).  On the morning of March 27, 2015, with the quarter drawing to a close and while in the midst of those negotiations, Montgomery informed Debrabandere by email that Medikon was "uncomfortable paying for Grafix now" but that Osiris could get "$250K for Cartiform," though Osiris might have to "dip" into its supply of 20mm products to fulfill the order.  (ECF 154-11, Ex. 115). Debrabandere responded via an email sent from his cellular phone, noted that he was still on a phone call, and stated: "We have flexibility. We can include Grafix and later swap to Cartiform, when we have it.  If he pays 250 for a 500 order, I would be fine with that.  If he can pay 375 for a 750 order, that would be great[.]"  (*Id.*).  Later that day, Debrabandere sent an email to Jacoby stating that "Turkey is in the bag for $500k" but that he was "[p]ushing for $750k."  (ECF 154-24, Ex. 627).

On March 30, 2015, the parties executed the agreement and a closing checklist, which documented the terms of Medikon's order.  (ECF 152-25, Ex. 604).  Pursuant to the closing checklist, Medikon was to purchase $750,000 worth of Cartiform, with $100,000 to be paid up front and the $650,000 balance to be paid by December 31, 2015.  (ECF 152-26, Ex. 605).  The agreement provided that if Turkish authorities approved Grafix for import in Turkey, the $650,000 balance could be

applied to some combination of Grafix and Cartiform.[3]  (*Id.*).  Representatives of Medikon and Osiris—including Jacoby—signed the documents memorializing this agreement.  (*Id.*).

That same day, Jacoby approved a stocking order for Medikon consisting of $250,000 worth of Cartiform and $500,000 of Grafix, rather than Cartiform alone.  (ECF 152-14, Ex. 65).  The following day, March 31, 2015, Osiris discovered it lacked the inventory to supply the Cartiform required in the stocking order, and Jacoby approved a revised order comprised of $100,000 of Cartiform and $650,000 of Grafix.  (ECF 152-28, Ex. 607; ECF 152-30, Ex. 609).  Medikon did not sign or approve the revised stocking order, which was inconsistent with the closing checklist.  (ECF 152-30, Ex. 609).  Jacoby testified that this modification to the stocking order "came to the Osiris customer service people and to me from Dwayne [Montgomery] after his discussion with the Medikon people."  (ECF 152-39, Ex. 617, Jacoby Dep. at 195).  On April 20, 2015, product for Medikon was shipped not to Medikon in Turkey, but to a third-party storage facility in Baltimore, and Jacoby admitted that it was initially "stored under the Medikon name under the Osiris contract."  (ECF 152-32, Ex. 610(2); ECF 152-39, Ex. 617, Jacoby Dep. at 68, 193).

As required under the agreement, Medikon paid Osiris only $100,000 by the end of the first quarter of 2015, (ECF 47, ¶¶ 8, 69), yet Osiris recognized $750,000 of revenue associated with the transaction in the first quarter, (ECF 152-33, Ex. 611).  Jacoby signed and certified the filing reporting this revenue, (ECF 152-10, Ex. 55 at 19, 21, 22), and Debrabandere publicly reported it in Osiris's first quarter 2015 quarterly earnings call, (ECF 154-29, Ex. 632 at 30).  In the third quarter of 2015, Osiris restated $650,000 of the $750,000 transaction, (ECF 57 ¶ 74), and Jacoby and Debrabandere both signed the filing restating this revenue, (ECF 152-2, Ex. 1 at 9, 37, 47; ECF 154-2, Ex. 1 at 8–9, 38).

**III.   Stryker**

---

[3] Medikon did not ultimately obtain regulatory approval.  (ECF 152-34, Ex. 612; ECF 152-5, Ex. 4 at 158).

6

In December 2014, Stryker Orthopedics became the exclusive distributor of Bio4, one of Osiris's products used for bone repair and regeneration.  (ECF 38, Am. Compl., ¶ 21; ECF 47 ¶¶ 9, 92).  The agreement between Stryker and Osiris allowed Stryker to sell Bio4 at any price above a set minimum but potentially lower than Osiris's list price.  (*Id.* ¶¶ 9, 95).  In its 2014 Form 10-K and its 2015 Form 10-Qs for the first and second quarters, Osiris stated that revenue from the sale of Bio4 would be recognized based on the amounts charged to customers for the product.  (ECF 152-4, Ex. 3 at 153; ECF 152-10, Ex. 55 at 29; ECF 152-21, Ex. 600 at 7).  Starting in March 2015, Stryker sent monthly reconciliation reports to Osiris stating the amount of Bio4 it had sold in the previous month and the average price at which the products sold.  (*See, e.g.*, ECF 152-35, Ex. 613).

Jacoby personally received reports for February, March, June, and July of 2015.  (*Id.*; ECF 152-11, Ex. 56; ECF 152-12, Ex. 57; ECF 152-13, Ex. 60; *see also* ECF 152-39, Ex. 617, Jacoby Dep. at 46–48).  Jacoby testified that these reports were "based upon the Stryker method of recognizing revenue, where it was based upon the completed paperwork coming in," but concluded that Stryker's figures "didn't relate at all to [] product Osiris actually shipped."  (ECF 152-39, Ex. 617, Jacoby Dep. at 47–48).  This is because the reports included data only for the units of Bio4 for which Stryker had received a purchase order as of the date of the report, and not units which were implanted in patients as of the date of the report, as purchase orders sometimes lagged behind product implantation by weeks.  (ECF 167-48, Ex. 657, Ochs Dep. at 142–43; ECF 167-15, Ex. 105).

On March 16, 2015, Osiris employee Marie Suri emailed Jacoby to notify him that the prices reported from Stryker did not coincide with Osiris's higher list price and to ask if it would "fly" with Osiris's auditors to record the revenue at list price without "receiving the cash."  (ECF 152-7, Ex. 25).  In response, Jacoby stated that he had "already vetted this" and noted that the sales price is "what they sold it for" but asked Suri to try to "show what they sold it for compared to our 'normal' list price."  (*Id.*)  At his deposition, Jacoby could not recall with whom he had vetted the issue but indicated he did

not discuss the issue of "average sales prices versus the suggested list price" with anyone outside of Osiris.  (ECF 152-39, Ex. 617, Jacoby Dep. at 49, 120).

Ultimately, Osiris recognized revenue from these transactions using its own list price for Bio4 rather than the actual sales price reflected in Stryker's purchase orders, which allowed Osiris to report an extra $1.3 million in the first and second quarters of 2015.  (ECF 152-2, Ex. 1 at 9, 47).  Jacoby signed and certified the filings reporting this revenue.  (ECF 152-10, Ex. 55 at 19, 21, 22; ECF 152-21, Ex. 600 at 20, 22, 23).  Osiris later restated this excess revenue in a filing signed and certified by Jacoby.  (ECF 152-5, Ex. 4 at 157–58).

### IV.    Stability & Dover

In late 2014 and during the first three quarters of 2015, Osiris also sold products to Dover through Stability, one of its distributors.  (ECF 57 ¶¶ 129, 130).  Noting that the fourth quarter of 2014 was "becoming a big challenge," Debrabandere "asked Brian [Martin, Stability's CEO,] to increase his number from $4.3 to at least $5 [m]illion[.]"  (ECF 154-13, Ex. 153).  In a September 23, 2015, email concerning a payment plan for these products, Martin stated that this increase was "above and beyond" Stability's needs.  (ECF 154-6, Ex. 17).

Osiris recorded revenue when product was sold to Stability, with payment due within thirty days, rather than when it actually received cash payment.  (ECF 154-30, Ex. 633, Rogers Dep. at 104–05; ECF 154-36, Ex. 639 at 13058).  By January of 2015, Stability owed approximately $7.5 million to Osiris, more than $4 million of which was more than 90 days past due.  (ECF 154-35, Ex. 638).  A payment plan was eventually adopted, and the controversy surrounding that plan led to a series of emails which the SEC believes establishes that Debrabandere and Martin had a secret side agreement which would permit Stability to pay for product only once it was actually sold, and which would therefore allow Osiris to inflate revenue by offloading excess product to Stability.

In the first email, from September 23, 2015, Debrabandere says "Yup indeed" in response to a message, forwarded to him by Jacoby, in which Martin states: "if you don't want us to return the

Grafix then you need to understand where we can sell it." (ECF 154-6, Ex. 17). In the second email, from December 21, 2015, Martin states "As always, we will move what we can (and pay for what we sell) but we will need you to find a solution for additional product or we will have to return it. . . . In terms of Grafix, . . . best if you find a different solution sooner rather than later so we don't have to return the product." (ECF 154-7, Ex. 22). Debrabandere did not directly respond to this but forwarded the message to others at Osiris to ask if they were available for a meeting. (*Id.*). And in the third email, from February 5, 2016, Martin writes to Montgomery:

> [T]he plan was to pay for Ovation as we sold Ovation—we weren't going to extend ourselves financially to cover the inventory costs. While we may be slightly behind in that payment plan, that is what was agreed to. In order to rectify the late payments, we came up with the payment plan below. This was communicated and no one has come back to us challenging the plan. The only caveat was that we were not going to pay for inventory that expired. Lode committed to that. Let me know if you need clarification but this is what was agreed to.

(ECF 154-8, Ex. 23).

Debrabandere signed management representation letters to Osiris's auditors stating that to the best of his knowledge there were no material transactions that had not been properly recorded, that he had no knowledge of fraud or suspected fraud involving management, and that there were no side agreements or other undisclosed arrangements. (ECF 154-19, Ex 437 at 94168, 94176; ECF 154-21, Ex. 442 at 899, 903).

Osiris ultimately recognized $14.98 million in revenue from sales to Stability and Dover in 2014, and another $4.64 million in 2015. (ECF 154-14, Ex. 190 at 3; ECF 154-15, Ex. 191 at 3). Debrabandere also signed and certified Osiris's financial filings claiming this revenue, (ECF 57 ¶ 18), and he publicly reported this revenue on quarterly earnings calls in each of the relevant quarters, (ECF 154-38, Ex. 641 at 64; ECF 154-39, Ex. 642 at 56; ECF 154-40, Ex. 643 at 46; ECF 154-41, Ex. 644 at 38; ECF 154-29, Ex. 632 at 30; ECF 154-42, Ex. 645 at 20; ECF 154-43, Ex. 646 at 10). Osiris likewise later restated the revenue associated with these transactions to report them on a cash basis, reducing the valuation by approximately $7.5 million. (ECF 154-14, Ex. 190 at 3).

*** 

On May 27, 2015, Jacoby exercised stock options to purchase 11,389 shares at $7.74 per share, 3,751 shares at $6.46 per share, and 4,860 shares at $7.13 per share, and he sold 20,000 shares at $18.55 per share on the same day.  (ECF 47 ¶ 16; ECF 152-38, Ex. 616).  In early 2015, Osiris's Compensation Committee increased Debrabandere's base salary by ten percent, to $396,000, and awarded him a $150,000 bonus for the year ending December 31, 2014, on the basis of, among other things, having exceeded revenue goals, supported development, and revitalized corporate culture.  (ECF 154-23, Ex. 626, Debrabandere Adm. ¶¶ 7–8; ECF 154-17, Ex. 208).

## PROCEDURAL HISTORY

The SEC filed a complaint against Debrabandere, Jacoby, Law, Montgomery, and Osiris on November 2, 2017.  (ECF 1).  Judgment was entered against Osiris on November 7, 2017.  (ECF 4).  Debrabandere filed a motion to dismiss (ECF 17), which this court denied on August 3, 2018 (ECF 55).  Thereafter, judgment was entered against Montgomery (ECF 119) and Law was dismissed from the action by stipulation (ECF 112).  Then, on August 21, 2020, the SEC filed motions for partial summary judgment against Jacoby (ECF 152) and Debrabandere (ECF 153).  Those motions have been fully briefed and oral argument was heard on December 14, 2020.[4]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718

---

[4] Debrabandere has also moved for leave to file a surreply (ECF 189) on the grounds that the SEC, in its reply brief, for the first time explained its theory why certain statements relating to Osiris's distributor Stability are not inadmissible hearsay. Leave to file a surreply may be granted when the movant otherwise would be unable to contest matters presented in the opposing party's reply. *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 663 (D. Md. 2013).  Because the SEC referenced all the statements which are purportedly hearsay in its opening brief, affording Debrabandere an opportunity to demonstrate why they are inadmissible, and because the issue was addressed at oral argument, the motion will be denied.

F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.*

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247–48.  The court must view the

evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866

(2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's

favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin.*

*Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015).  At the same time, the court must "prevent

factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football*

*Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.

1993)).

## DISCUSSION

In this action, the SEC has moved for summary judgment against both Jacoby and

Debrabandere on each of the following six claims:

1. Violation of the Exchange Act Section 10(b) and Rule 10b-5 thereunder;

2. Violation of the Securities Act Section 17(a);

3. Violation of Rule 13b2-2 of the Exchange Act;

4. Violation of Rule 13a-14 of the Exchange Act;

5. Aiding and Abetting Osiris's violations of Section 13(a) of the Exchange Act and Rules
   12b-20, 13a-1, 13a-11 and 13a-13 thereunder; and

6. Violation of Section 304(a) of the Sarbanes-Oxley Act of 2002.

Much of the SEC's case against Jacoby depends on its ability to collaterally estop him, on the

basis of a prior criminal conviction, from denying facts relevant to these claims.  And the SEC's case

against Debrabandere relies in some part on its ability to draw an adverse inference from

Debrabandere's wholesale invocation of his Fifth Amendment right against self-incrimination.

Therefore, the court will first address these threshold issues and then proceed to evaluate the merits of

the alleged violations of the securities laws.

## I.        Collateral Estoppel

If certain criteria are met, the doctrine of collateral estoppel bars a party from relitigating an

issue of fact or law determined against that party in an earlier action, even if the second action differs

significantly from the first one.  *Montana v. United States*, 440 U.S. 147, 153 (1979).  Here the SEC

raises nonmutual offensive collateral estoppel, which allows a non-party to a previous action to prevent

a defendant in the current action from relitigating issues already decided against him in the previous

action.  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–32 (1979).  In the Fourth Circuit, a party

asserting collateral estoppel must establish:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue
> must have been actually determined in the prior proceeding; (3) determination of the
> issue must have been a critical and necessary part of the decision in the prior
> proceeding; (4) the prior judgment must be final and valid; and (5) the party against
> whom estoppel is asserted must have had a full and fair opportunity to litigate the issue
> in the previous forum.

*Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

In this case, the SEC believes Jacoby is estopped from denying that he created a false document

and caused it to be transmitted to Osiris's auditors in connection with Osiris's public filings.  (ECF 152

at 23).  Jacoby counters that the guilty plea did not go beyond any issues relating to the fact that the

date on the memo was false but concedes that he is bound by the words of his allocution and his other

sworn statements made to the court in his criminal case.[5]  (ECF 167 at 25, n.7).  Thus, the dispute

primarily concerns the scope of the issues that were critically and necessarily decided in the prior

criminal proceeding.

---

[5] Regardless of whether Jacoby is collaterally estopped from contradicting these statements, they are admissions of a party opponent.  Thus, they are not hearsay under the Federal Rules of Evidence and they are admissible.  *See* Fed. R. Evid. 801(d)(2)(A).

Under Fourth Circuit precedent, only issues necessary to the outcome of the first action, including issues necessary to the entry of a plea agreement, are embraced by collateral estoppel. *See United States v. Wight*, 839 F.2d 193, 196 (4th Cir. 1987). While the information on which Jacoby was charged contains some facts that may not have been necessary to his criminal conviction, Jacoby's plea colloquy establishes that by falsely backdating a document memorializing a transaction with PhysioRx that did not then take place, he knowingly and willfully made false statements to auditors in connection with their review of documents required by law to be filed with the SEC. (*See* ECF 152-23, Ex. 602, Plea Colloquy, at 10, 14–15 (Jacoby admitting that "[t]he terms and conditions of the sale were verbally agreed to by all the parties, but written documentation was not obtained prior to fiscal year end")). These issues were necessary to the criminal conviction for backdating a letter and causing it to be submitted to Osiris's auditors.

The court therefore holds that Jacoby is estopped from denying that he falsely backdated a document memorializing a PhysioRx transaction that did not occur on the purported date, and from denying that he knowingly and willfully made false statements to auditors in connection with their review of documents required by law to be filed with the SEC.

## II.     Adverse Inference

Debrabandere has invoked his Fifth Amendment right against self-incrimination in this matter, and the SEC contends that the court is therefore permitted to draw an adverse inference against him for the purposes of this summary judgment motion.  The Supreme Court "has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).  The "prevailing rule" is that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  *Id*. at 318; s*ee also ePlus Techn., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("In a civil proceeding, a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self-incrimination.").  But because courts are required to draw all reasonable inferences in favor of the nonmoving party on a motion for summary judgment, an adverse inference is permissible to support the moving party's case only if the moving party has other evidence by which to make its case.  *See SEC v. Colello*, 139 F.3d 674, 677–78 (9th Cir. 1998) (district court committed no error in finding adverse inference against defendant based on invocation of Fifth Amendment at summary judgment because there was additional evidence to support the SEC's case); *see also Maryland v. Universal Elections, Inc*., 862 F. Supp. 2d 457, 464 (D. Md. 2012) (adverse inference  considered for purposes of corroborating other evidence which established the elements necessary to grant summary judgment), aff'd 729 F.3d 370 (4th Cir. 2013).  In sum, at the summary judgment stage, an adverse inference may not alone make a case, but it can make a case stronger.  The court is permitted to consider an adverse inference based on Debrabandere's silence where the SEC has adduced sufficient other evidence relevant to a given claim.

## III.     Count 1: Exchange Act Section 10(b) and Rule 10b-5

Section 10(b)[6] of the Securities Exchange Act of 1934, and Rule 10b-5[7] thereunder, make it unlawful to use any "manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security."  15 U.S.C. § 78j.  Together, Section 10(b) and Rule 10b-5 prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007), and they are "designed to protect investors involved in the purchase and sale of securities by requiring full disclosure," *SEC v. DCI Telecommunications, Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000).  Indeed, the purpose of Section 10(b) is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972).  To achieve this end, the Exchange Act is not to be construed "technically and restrictively, but flexibly to effectuate its remedial purposes."  *Id.*

To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove that the defendant: (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities.  *SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 239 (4th Cir. 2009) (citing *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006)).

### A.     Falsity

---

[6] The statute, 15 U.S.C. § 78j, provides in relevant part:
>   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[7] Rule 10b-5, 17 C.F.R. § 240.10b-5, provides:
>   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>   (a) To employ any device, scheme, or artifice to defraud,
>   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>   (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
>   in connection with the purchase or sale of any security.

Rule 10b-5's falsity element requires that the SEC show the defendant acted deceptively. *Pirate Inv'r*, 580 F.3d at 239.  Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct.  *Id*. at 239–40.  The backdating of contracts can constitute a deceptive act.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008) (noting that respondents' course of conduct included the backdating of contracts to make it appear that they were negotiated earlier and thus were unrelated to other transactions).[8]

The court will address each allegedly fraudulent transaction in turn.

   i.  *PhysioRx*

Jacoby admits he made a false statement to auditors with respect to the PhysioRx transaction, but disputes that his criminal conviction establishes his statements were deceptive vis-à-vis investors.  Though the court accepts that deceptive conduct may require an act that "gives the victim a false impression," *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008), it is not persuaded by Jacoby's argument that the only relevant victim in a 10b-5 action is not an auditor but the investing public.[9]

First, while Jacoby's criminal conviction related to his role in deceiving auditors, he nevertheless admitted under oath to engaging in a generally deceptive course of conduct.  (*See, e.g.*, ECF 152-23, Ex. 602, Plea Colloquy, at 15 ("I understood that [the auditor] was looking for documentation from 2014 and that no such documentation existed.  Despite that, I drafted a memo on November 5, 2015, that purported to reflect the terms of the agreement with PhysioRx.  I dated the

---

[8] Jacoby asserts that *Stoneridge* only says backdating "can be" deceptive, not that it "is" deceptive.  (ECF 167 at 30).  A more plausible reading is that *Stoneridge* distinguishes the conduct that "can be" deceptive from the written deception inherent in backdating.  *See* 552 U.S. at 158 ("Conduct itself can be deceptive, as respondents concede.  In this case, moreover, respondents' course of conduct included both oral and written statements, such as the backdated contracts agreed to by Charter and respondents.").

[9] In any event, this argument goes more to intent rather than falsity.  If, as Jacoby maintains, he only backdated the memo because he was frustrated with the auditors, that might suggest a lack of intent to act deceptively, but it does not negate the falsity of the act of backdating.

memorandum December 29, 2014, which was false.")).  Second, the cases to which Jacoby cites do not

adequately support his argument.  These cases include, among others, *Lucent Technologies* and *In re*

*Global Crossing*.[10]   In *Lucent Technologies*, a case dealing with alleged misstatements made in public

filings, the court noted that if the investing public lacks knowledge about an act, then there can be no

deception.  610 F. Supp. 2d 342, 359–60 (D.N.J. 2009).  But the *Lucent* court, confronted with a case

concerning allegedly deceptive statements made in public filings, reasonably assumed that the victims

would necessarily be the investing public, without holding that they must be the investing public.  *Id.*

at 359.  Next, the *Global Crossing* court did characterize Rule 10b-5 as prohibiting the use of any

device that would "perpetrate fraud on investors."  322 F. Supp. 2d 319, 328 (S.D.N.Y. 2004).  Yet this

language appears in the court's recitation of the legal standard, contains no citation to caselaw, appears

to be a shorthand summary of the cause of action as it relates to the facts of that case, and does not

appear to otherwise limit the falsity requirement to actions that are false vis-à-vis investors.

The act of creating a document after the fact and backdating it to make it appear as though it

existed in 2014 was plainly deceptive.  *See SEC v. Kearns*, 691 F. Supp. 2d 601, 618 (D.N.J. 2010)

(allegations that defendants affirmatively misled auditors were sufficient to allege inherently deceptive

conduct for scheme liability claim); *cf. SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 769 (S.D.

Ind. 2018) ("Courts have held that concealing information from auditors can constitute deceptive acts

for purposes of claims brought under Rule 10b-5(a) and (c).").  The plain text of Rule 10b-5 makes it

unlawful to engage in any act that "would operate as a fraud" upon "any person."  17 C.F.R. 240.10b-

5(c); *cf. United States v. Naftalin*, 441 U.S. 768, 772–73 (1979) (noting, in a Section 17(a) case, that a

victim may be a broker); *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396 (2d Cir. 1967) (noting, in

deciding that a private right of action under § 10(b) and Rule 10b-5 is not limited to actions brought by

investors, that neither the statute nor the rule speaks of limiting the nature of a violation to cases

---

[10] The other case cited by Jacoby on this point is *SEC v. Benger*, 931 F. Supp. 2d 908, 913 (N.D. Ill. 2013), which is inapplicable for the same reasons as *Global Crossing*.

involving fraud on investors).  Accordingly, there is no genuine dispute of material fact as to whether Jacoby engaged in deceptive conduct.[11]

      *ii.*    *Medikon*

The SEC argues that Jacoby engaged in deceptive conduct by directing a shipment of unordered products to Medikon and recognizing the revenue therefrom.  (ECF 152 at 27).  Jacoby argues that there is a genuine dispute over whether the product was actually unordered because no "percipient witness" has testified it was not ordered.  (ECF 167 at 36).  Yet the distribution agreement and stocking orders signed by Jacoby show that Medikon agreed to purchase Cartiform, not Grafix. (ECF 152-26, Ex. 605, Medikon Distr. Agreement).  And while Jacoby argues that some documents show Medikon had applied for regulatory approval to import both Cartiform and Grafix and show Medikon stated that "Grafix is our target," this evidence goes to the issue of whether Medikon *desired* Grafix, not whether it *ordered* Grafix.  The SEC has produced an abundance of documentary evidence showing that Medikon did not order Grafix, and Jacoby has not produced any documentary evidence to the contrary.  Accordingly, there is no genuine dispute that Jacoby's role in approving the stocking orders, claiming revenue from the transaction, and signing and certifying the related filings amounted to deceptive conduct.

With respect to Debrabandere's involvement in the Medikon transaction, the SEC claims he directed Osiris to include Grafix in the stocking orders despite having been told that Medikon ordered only Cartiform and was uncomfortable paying for Grafix.  (ECF 154 at 25–26).  Yet there is scant evidence in the record from which one could conclude that Debrabandere *directed* that Medikon be shipped any products it did not order.  In an email exchange, Montgomery wrote to Debrabandere:

---

[11] Jacoby also argues that the revenue recognition from the PhysioRx transaction was proper and that, other than the backdating, the memoranda was "otherwise factually correct."  (ECF 167 at 24).  Assuming the truth of this assertion, which is contradicted by the information (*see* ECF 152-24, Ex. 603 (noting that Jacoby did not finalize the PhysioRx transaction until January 2015, and that he emailed PhysioRx's CEO on January 5, 2015, and January 8, 2015, requesting that the transaction be finalized)), it still does nothing to negate the falsity of the backdating and is therefore not a material fact for the purposes of this motion.

Okay interesting twist last evening . . . the fun of deal making. So Sinan [the Medikon counter-negotiator] described uncomfortable paying for Grafix now. $250k for Cartiform is no problem. So basically I said deal is off . . . I have to have $500K . . He came back and asked if he could get some additional time for the additional Cartiform. I let him know that I would need until this afternoon to work through this. This is the opportunity I have been looking for . . "How can I turn this into $1M or at least $750K?" I am awaiting a call from Phil to see if we can book the complete revenue as long as I have a [purchase order] and $250K cash and give Sinan payment plan in 2015 to pay off balance by end of 2015. We don't have enough Cartiform at this moment unless we dip into the 20mm's. I am confident Phil will be okay with this. Your thoughts Lode?

Debrabandere wrote back: "We have flexibility. We can include grafix and later swap to cartiform, when we have it[.]" (ECF 152-16, Ex. 115). Resolving all inferences in Debrabandere's favor, as the court must, it is not clear that this response constitutes an order or a direction to Montgomery to do anything deceptive. Debrabandere was being informed of the status of negotiations prior to the finalizing of any contract or distribution agreement, and in response he told Montgomery the company was flexible and proposed one option for moving forward. The court cannot conclude, without drawing an adverse inference, that this constituted an order. Perhaps, a trier of fact might conclude, Montgomery was proposing a way to negotiate different contractual terms, rather than a way to ship Medikon products it did not order. On the basis of this conduct, the SEC has failed to make out a prima facie case that Debrabandere violated Rule 10b-5.[12]

  *iii.*   *Stryker*

Osiris represented to investors, in public filings signed by Jacoby, that it recognizes revenue from product distribution when title passes to the customer and that, with respect to Stryker in particular, it would recognize as revenue the amounts Stryker charged to customers for Bio4. (ECF 152-4, Ex. 3 at 153). Jacoby knew it was not proper to recognize revenue from these transactions at

---

[12] Nor would an adverse inference based on Debrabandere's refusal to testify be appropriate to draw here, where the SEC has failed to proffer other sufficient undisputed evidence. As for the SEC's other basis for showing a deceptive act, Debrabandere's conduct in certifying the filings would not amount to deception if he did not commit the underlying act of directing that Medikon be supplied with Grafix or if he did not know such an act had been undertaken by Montgomery, Jacoby, or others. The SEC provides no evidence that Debrabandere was sent any of the documents pertaining to this transaction or that he played a role in finalizing its ultimate terms.

Osiris's list price, but he disregarded that knowledge and permitted Osiris to overstate its revenues by approximately $1.3 million in the first and second quarters of 2015.  (ECF 152-18, Ex. 334 at 2; ECF 152-10, Ex. 55 at 19, 21, 22; ECF 152-21, Ex. 600 at 20, 22, 23).  Still, Jacoby contends that the SEC has ignored evidence that challenges whether his conduct was deceptive: in particular, evidence showing Stryker's reconciliation reports were inaccurate and incomplete, and Stryker's own representation that it rarely offered discounts.  (ECF 167 at 39).

Jacoby says the reports were inaccurate because they only included summary data based on units for which they had a purchase order, even though there could be a lag of several months between when the product was implanted in a patient and when Stryker received a purchase order for that product.  (ECF 167-15, Ex. 105; ECF 167-48, Ex. 657, Ochs Tr., at 142–43).  But even assuming that the reports were inaccurate insofar as they did not include all purchase orders, it is still deceptive to record revenue based on a higher list price rather than the actual discounted price, especially after promising investors that revenue would be recorded at the actual sales price.[13]  And the frequency with which Stryker offered discounts goes to the scope of the deception rather than its existence.  There is no genuine dispute of material fact that this was a deceptive act.

iv.    *Dover/Stability*

With respect to Debrabandere's involvement in the Dover/Stability transaction, the SEC argues that (1) Debrabandere pressured Brian Martin, Stability's CEO, to take on more product than it needed to meet revenue goals; (2) despite the sales being made pursuant to thirty-day payment terms, Debrabandere induced Martin to reach a side-agreement whereby he would only pay for product that was ultimately sold to end users and could return any unsold product; (3) this resulted in Stability, with Debrabandere's knowledge and blessing, failing to pay for approximately half of the $15 million in Osiris product which Osiris reported was sold to Stability; and (4) Debrabandere did not disclose the

---

[13]  The argument that this does not amount to deceptive conduct because Stryker represented that it was not substantially discounting from the list price also goes to the scope of the deception rather than its existence.

side agreement to his auditors even when asked about such agreements.  (ECF 154 at 26–27).  The only evidence the SEC has of a side agreement are three emails, all of which were sent by Martin. Debrabandere claims the relevant statements from these emails constitute inadmissible hearsay, while the SEC believes they are admissible as adoptive admissions.[14]

Hearsay—an out-of-court statement offered to prove the truth of the matter—must be excluded as evidence at trial, unless it falls within an exception to the hearsay rule or is otherwise permitted by the Constitution or by statute.  *See* Fed. R. Evid. 802.  Hearsay evidence cannot support or defeat a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c); *see also Greensboro Pro. Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).  The Federal Rules of Evidence define certain out-of-court statements as not hearsay, including statements offered against an opposing party and which the opposing party manifested that it adopted or believed to be true—a so-called adoptive admission.  *See* Fed. R. Evid. 801(d)(2)(B).   The burden of showing adoption is on the party seeking admission of the purported adoptive statement.  WRIGHT & MILLER, FED. PRAC. & PROC. § 6774 (2020 ed.); *see also Vazquez v. Lopez-Rosario*, 134 F.3d 28, 35 (1st Cir. 1998).  To determine whether a party has adopted another's statement, the test is "whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement."  *United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006) (internal quotations omitted).  Silence can manifest adoption of a statement, *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001), though it is often "thought to lack probative value on the question of whether a person has expressed tacit agreement or disagreement with contemporaneous statements of others," *United States v. Hale*, 422 U.S. 171, 176 (1975).  Ultimately, silence should be treated as acquiescence "only if it would have been natural under the circumstances to object to the

---

[14] Martin, Dover's CEO, also has invoked the Fifth Amendment and will not testify.

assertion[.]"  *Id.*  And as the Advisory Committee Notes explain, the decision "calls for an evaluation in terms of probable human behavior."  *See* Fed. R. Evid. 801, Advisory Committee Note (1972).

First, on September 23, 2015, Debrabandere wrote "Yup indeed" to Jacoby in response to an email message, forwarded to him by Jacoby, in which Martin states: "We have territory of hospital . . . and have helped out Osiris immensely with purchasing inventory above and beyond our needs so if you don't want us to return the Grafix then you need to understand where we can sell it."  (ECF 154-6, Ex. 17).  Assuming without deciding that "Yup indeed" is sufficient to adopt Martin's statements, it is not clear from this brief statement what exactly Debrabandere would be adopting—the fact that he is aware of the information being forwarded to him by Jacoby, the fact that Stability had a territory of one hospital, the fact that Stability purchased inventory above and beyond its needs, the fact that Osiris needs to understand where Stability could sell Grafix, the fact that Grafix could be returned, some combination of those assertions, or all of them.  The SEC believes, at a minimum, that Debrabandere has adopted Martin's statement that it was possible to return Grafix.  But there are insufficient foundational facts to draw that conclusion on the basis of such a brief electronic message, sent in response to an email containing many different statements, from a person tasked with running a large business.

Second, on December 21, 2015, Martin emailed Debrabandere and stated: "As always, we will move what we can (and pay for what we sell) but we will need you to find a solution for additional product or we will have to return it. . . . In terms of Grafix, . . . best if you find a different solution sooner rather than later so we don't have to return the product."  (ECF 154-7, Ex. 22).  Debrabandere did not directly respond to this but forwarded the message to others at Osiris to ask if they were available for a meeting.  (*Id.*).  The act of forwarding another's message can under some circumstances constitute an adoption of the forwarded content, *see Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002), but when a party "forwards a document while acting as a mere messenger, this does not constitute an adoption," *Transbay Auto Serv., Inc. v. Chevron USA Inc.*, 807 F.3d 1113,

1118 (9th Cir. 2015).  Drawing all inferences in Debrabandere's favor, the very purpose of the meeting

may have been to discuss how best to respond to Martin's message.  And unlike in face-to-face oral

communication, where objections to statements would naturally occur contemporaneously, in the

context of business email communications, it may have been natural for Debrabandere to have delayed

an immediate response so as not to antagonize an important distributor, and to have instead sought a

meeting with his colleagues.  The court cannot conclude, without drawing a disputed factual inference,

that such action constitutes an adoption.[15]

And third, on February 5, 2016, Martin emailed Montgomery and not Debrabandere the

following message:

> [T]he plan was to pay for Ovation as we sold Ovation—we weren't going to extend
> ourselves financially to cover the inventory costs.  While we may be slightly behind in
> that payment plan, that is what was agreed to.  In order to rectify the late payments, we
> came up with the payment plan below.  This was communicated and no one has come
> back to us challenging the plan.  The only caveat was that we were not going to pay for
> inventory that expired.  Lode committed to that.  Let me know if you need clarification
> but this is what was agreed to.

(ECF 154-8, Ex. 23).  There is no evidence that Debrabandere, who was not copied on the email and

who at the time it was sent was no longer employed at Osiris, ever received the email.  Accordingly, he

would not have had an opportunity to deny the statement, much less to adopt it.  This statement—

offered by Martin, who will not testify, to prove the truth of the matter—cannot be categorized as

nonhearsay under Rule 801(d)(2)(B).  Therefore, the court may not rely on it for the purposes of

granting summary judgment against Debrabandere.

And even if these emails were admissible, there is some contrary evidence in the record

suggesting that no such side agreement existed.  (*See, e.g.*, ECF 160-55, Ex. 702, Jacoby. Dep. at 67

("[W]as the agreement that Dover should pay for the product as it sold the product?" Answer: "No.");

ECF 160-57, Ex. 704, Jezek Dep. at 152 ("Did you ever hear of Stability claiming it had a right of

---

[15] Whether the statements are admissible at trial is a separate question which the court does not reach.

return on the Osiris products?" Answer: "The – all of the products that we ship were returnable, if they came back in the original box that it shipped in. That was our policy . . . So that wasn't specific to Stability.")).  The SEC has therefore failed to establish it is entitled to summary judgment against Debrabandere with respect to the Stability transactions as well.

***

In sum, the court holds that the SEC has made its case that Jacoby engaged in deceptive conduct on the basis of the PhysioRx, Medikon, and Stryker transactions, but that it has not made its case that Debrabandere engaged in deceptive conduct.  This is fatal to the SEC's motion for summary judgment on its 10b-5 claim against Debrabandere.  Accordingly, the court will analyze the remaining elements of the 10b-5 claim as to Jacoby only.

### B.     Materiality

A fact stated or omitted is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact."  *Pirate Inv'r*, 580 F.3d at 240 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).  This determination requires a "delicate assessment[]" of the inferences which a reasonable shareholder would draw from a set of facts.  *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976)).

In this case, the SEC argues that Jacoby's overstatement of revenue in Osiris's public filings were material misstatements signed off on by Jacoby and which Osiris admitted were material in subsequent restatements.  (ECF 152 at 30).  Jacoby appears not to directly contest this insofar as it relates to the PhysioRx transaction but he argues genuine disputes exist with regard to the Medikon and Stryker transactions.  (ECF 167 at 42).

The SEC relies on two primary sources to establish the materiality of the Medikon misstatement.  First, the SEC points to the rebuttal report of John Lacey, which concludes that the

24

$650,000 worth of misstated revenue from the Medikon transaction was material.  (ECF 167-60, Ex. 669 at 3).  Second, the SEC points to Osiris's restatements, signed and certified by Jacoby, which refer to the Medikon transaction as a "material error."  (ECF 152-2, Ex. 1 at 37; ECF 152-5, Ex. 4 at 157–58; ECF 152-41, Ex. 619, Rogers Dep. at 71–72 (confirming the material errors related to the Medikon transaction)).  To counter this evidence, Jacoby claims investors are primarily interested in revenue growth and goals and points to the SEC's admission that it would have met its internal and external revenue goals even without, for example, the Medikon revenue.  (ECF 167 at 42).  Yet Jacoby cites no authority to demonstrate that to be material the value of a misstated transaction must be the cause in fact of a company's failure to meet its internal or external revenue goals.  Instead, the test is whether a reasonable purchaser or seller of a security would find the misstated transaction to be important in deciding whether to buy or sell the security or whether it would significantly alter the total mix of information available.  In this case, the company's decision to publicly restate the transaction and label it a material error, combined with the expert report demonstrating the material nature of the misstatement, establishes its materiality.  Even if (because Osiris still met its revenue goals) one's decision to buy or sell Osiris would not be altered by disclosure of the $650,000 in inflated revenue, a reasonable juror could not conclude that such a disclosure would not "significantly alter" the "total mix" of information.  *Pirate Inv'r*, 580 F.3d at 240.

Next, as to the Stryker transaction, Jacoby argues the SEC's own expert concedes that the Stryker revenue was not material.  At least as to the first quarter of 2015, this is true: Lacey's report shows that the Stryker restatement fell just below the materiality threshold in that quarter.  (*See* ECF 167-60, Ex. 669, Lacey Rebuttal Report, Ex. 3E).  In all, Osiris restated approximately $1.3 million in revenue attributed to Stryker—double the amount it restated with respect to Medikon—but the majority of that came in the second and third quarter of 2015.  (*See id.*).  Thus, there is a genuine dispute of material fact as to whether the quarter one filing was a material misstatement, but there is no genuine dispute of material fact as to the filings in quarter two and quarter three.

25

### C.   Scienter

To establish scienter, the SEC must show that a person acted "intentionally or recklessly."

*Pirate Inv'r*, 580 F.3d at 241.  To prove intent, a plaintiff must show that the "'defendant acted with a

mental state embracing intent to deceive, manipulate, or defraud.'" *Maguire Fin., LP v. PowerSecure*

*Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017) (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d

874, 884 (4th Cir. 2014).  Recklessness requires proving a defendant acted highly unreasonably and

with such an extreme departure from the standard of ordinary care "as to present a danger of

misleading the plaintiff."  *Id.* (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343

(4th Cir. 2003)).  The fact that a defendant publishes statements when in possession of facts suggesting

that the statements are false is "classic evidence of scienter."  *Pirate Inv'r*, 580 F.3d at 243 (quoting

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)).

An award of summary judgment is "seldom appropriate" in disputes where state of mind is a

decisive element, *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005), but

"summary judgment on this issue is sometimes appropriate[,]" *SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir.

2008); *see also SEC v. Jakubowski*, 150 F.3d 675, 682 (7th Cir. 1998) (upholding summary judgment

on scienter where what was said on behalf of a defendant could not persuade a reasonable trier of fact).

In this case, the SEC argues that Jacoby acted with scienter when he knowingly created and

transmitted a backdated document memorializing the PhysioRx transaction, when he approved a

stocking order for Medikon containing products not listed on the distribution agreement he signed, and

when he disregarded his employee's concerns about recognizing revenue based on list prices rather

than the actual prices charged by Stryker.  The court will evaluate each transaction in turn.

#### i.   PhysioRx

Jacoby contends that the PhysioRx document accurately summarized all information related to

the transaction and therefore cannot support a finding that he intended to deceive investors.  (ECF 167

at 27, 31).  Specifically, he reiterates with regard to scienter his argument that he lacked intent to

deceive investors because his plea colloquy and sentencing hearing are evidence that he created the

Physio memo out of frustration with the auditors.  But this ignores the plain text of Rule 10b-5, which

does not require proving an intent to deceive any *specific* person or group, as it references only fraud

perpetrated on "any person."  *See* 17 C.F.R. § 240.10b-5(c) (making it unlawful to engage in a course

of conduct which would perpetrate a fraud on "any person"); *cf. U.S. v. O'Hagan*, 521 U.S. 642, 660

(1997) (Section 10(b) "refers to 'the purchase or sale of any security,' not to identifiable purchasers or

sellers of securities").  And it also confuses motive with intent: Jacoby's assertion that he acted out of

frustration with auditors, even when accepted as true, does nothing to negate the evidence that his

actions also intended to deceive the auditors.  Given that Jacoby has acknowledged under oath that he

intentionally falsified a document, no reasonable trier of fact could conclude that Jacoby lacked the

intent to deceive with respect to this transaction.

      *ii.    Medikon*

Next, Jacoby argues that he lacked scienter with respect to the Medikon transaction as he

reasonably relied on Montgomery and others for information concerning the transaction.  (ECF 167 at

37; ECF 167-45, Ex. 654, Jacoby Tr. at 191–92).  Jacoby testified:

> It was represented to me at the time we were negotiating the agreement that Medikon would
> require approval for a distribution in Turkey and I was told that it was a relatively routine
> matter . . . . I was also informed by Dwayne Montgomery in response to questions that I asked,
> that he had worked with Medikon at a previous employer of his, to obtain regulatory approval
> for a U.S. product in Turkey and that went through on a timely basis without any type of
> resistance at all.

(ECF 167-45, Ex 654, Jacoby Tr. at 191–92).  Jacoby also testified that Montgomery told him that

Medikon had agreed to the revised product allocation.  (*Id*. at 195).  The SEC argues that Jacoby's own

self-serving and uncorroborated testimony, which it believes is based on inadmissible hearsay, is

insufficient to create a genuine dispute.

A party's "self-serving opinion" cannot, "absent objective corroboration, defeat summary

judgment."  *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quoting *Williams v. Giant*

*Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  In *Giant Food*, for example, the Fourth Circuit Court of Appeals held that the plaintiff's testimony, unsupported by any factual assertions or corroborating evidence, that she "believed" her job performance evaluations were unfair, did not create a genuine dispute of material fact sufficient to defeat summary judgment.  370 F.3d at 433.  But in situations where a plaintiff does not offer "mere speculation" or just his "opinion," but rather testimony "as to the facts surrounding" a particular incident, summary judgment is improper.  *Lilly v. Crum*, No. 2:19-cv-00189, 2020 WL 1879469, at \*4 (S.D. W. Va. Apr. 15, 2020); *see also EEOC v. Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004) (distinguishing self-serving opinions from testimony citing alleged facts for purposes of summary judgment).[16]  After all, Rule 56 does not contain a corroboration requirement or bar self-serving testimony, and a court may not credit the evidence of the moving party while disregarding the evidence of the nonmoving party.  *See Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (vacating summary judgment award for this reason).[17]

Jacoby's testimony that others told him regulatory approval would be easily obtained, even if admissible, would not create a genuine dispute of material fact.  A likelihood that Medikon would obtain regulatory approval to import Grafix in the future would not negate Jacoby's intent to sell them products they had not yet actually ordered in the present or to book revenue from such a sale prematurely.  This testimony therefore would leave a reasonable juror with no basis on which to doubt that revenue was booked from a sale to which Medikon did not consent.

But Jacoby's testimony that he changed Medikon's stocking order in reliance on Montgomery's assertion that Medikon had modified its order is a closer question.  These statements are not self-serving opinions but rather assertions of fact which a jury may be entitled to weigh—if they are

---

[16] Unpublished opinions are cited for the soundness of their reasoning and not for their precedential value.
[17] The SEC's reliance on *Costar Realty Information, Inc. v. Field*, 737 F. Supp. 2d 496 (D. Md. 2010) is misplaced.  The court in that case did note that hearsay evidence without any evidentiary support—other than self-serving deposition testimony—was insufficient to create a genuine dispute of material.  *Id*. at 510.  But that case concerned self-serving testimony offered to prove that a contract contained terms which were contradicted by the explicit written terms of the contact itself.  *Id*. at 510.  In this case, by contrast, Jacoby's testimony is offered as evidence that there was an oral modification to the terms of a written contract.

admissible.  The statement was made out of court (and Montgomery has invoked his Fifth Amendment right against self-incrimination and will not testify) and if offered to prove that Medikon had in fact changed its order, it would be hearsay.  But if offered as evidence of Jacoby's state of mind—that is, not for the truth of the matter—then it is of little import whether Medikon actually changed its order.  That is, as it relates to scienter, it does not matter whether it was true that Medikon had revised its product order; it only matters whether Jacoby was told the order had been revised, such that a reasonable juror could believe he lacked the intent to falsify.  Accordingly, there is a genuine dispute of material fact with respect to Jacoby's scienter as it relates to the Medikon transaction.

> ### iii.  Stryker

Finally, Jacoby contends that the SEC has ignored evidence that he wished to raise the revenue recognition issue with Osiris's auditors, which he believes challenges whether his conduct as it relates to Stryker satisfies the scienter element.  (ECF 167 at 39–40).  Specifically, Jacoby cites an email sent to him by Law stating that (1) Stryker doesn't recognize revenue until a purchase order is received even though the product is implanted well before the purchase order is received, (2) Stryker wanted Osiris to recognize the revenue the same way, and (3) he was unsure how "this passes with their auditors."  (ECF 167-15, Ex. 105).  In response, Jacoby wrote on February 18, 2015: "Stryker isn't following GAAP—guess they could get away with this if the difference isn't material, but I think we need to look at it at the end of each fiscal quarter—let's discuss with [our auditors]."  (*Id.*).  Resolving all inferences in favor of Jacoby, it is possible this comment refers to a genuine desire to discuss with auditors the proper method for resolving the revenue recognition issues.  But there is no evidence that Jacoby did discuss such issues with the auditors, nor that he recorded revenue at the list price in reliance on advice from the auditors.  The SEC has shown that Jacoby's staff alerted him to the revenue recognition issues, that Jacoby knew Osiris was supposed to record the actual sales prices, and that he nevertheless failed to do so.  Even if Jacoby did, on February 18, 2015, intend to have a discussion at some date in the future with Osiris's auditors, this would not undermine the evidence that

Jacoby knew revenue recognition based on the list price was wrong, and that he nevertheless booked the revenue at that price—which, as the Fourth Circuit has said, is "classic evidence of scienter." *Pirate Inv'r*, 580 F.3d at 243.

### D.      In Connection With

The Supreme Court embraces an expansive reading of the "in connection with" requirement. *SEC v. Zandford*, 535 U.S. 813, 819 (2002).  Activity satisfies this element when it "touches" or "coincides" with a securities transaction.  *Pirate Inv'r*, 580 F.3d at 244.  Though the analysis is "a flexible one" that is best conducted on "a case-by-case basis," the Fourth Circuit has pointed to several factors to help determine whether activity has touched or coincided with a securities transaction: (1) whether a securities sale was necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was such that it would necessarily involve trading securities; (3) whether the defendant intended to induce a securities transaction; and (4) whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely.  *Id*. at 244–45.

The SEC persuasively cites to several cases for the proposition that SEC filings are publicly disseminated documents and the inclusion of material misrepresentations or omissions in such documents upon which investors rely satisfies the "in connection with" element.  *See, e.g., SEC v. Wolfson*, 539 F.3d 1249, 1262–63 (10th Cir. 2008); *SEC v. Huff*, 758 F. Supp. 2d 1288, 1353 (S.D. Fla. 2010).  The Fourth Circuit in *Pirate Investor* suggests, however, that whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely is just one of several factors to examine in determining whether the "in connection with" element is satisfied.  580 F.3d at 244.  Still, as the Fourth Circuit noted, "a fraud need not satisfy all of the factors to be 'in connection with' a securities transaction; a close fit with one factor may well be enough for a fraud to result in § 10(b) liability."  *Id*. at 245.

In this case, Jacoby's fraudulent memo appears to have been created to fend off a restatement and allow inflated revenues to remain on the books.  In his plea colloquy, Jacoby admitted he

understood the charge against him to include, among other things, that his "knowing and willful misconduct" of backdating the letter to Osiris's auditors "occurred in connection with an audit . . . of the financial statements of the issuer that were required to be filed by law with the SEC." (ECF 152-23, Ex. 602, Plea Colloquy., at 10; *see also id.* at 16–17 (Jacoby's attorney confirming the government attorney's representations that Osiris was required to file financial statements with the SEC and that the audit was in connection with those statements)).[18]  Additionally, Jacoby played a prominent role in filing public documents with the SEC claiming revenue from the Stryker transaction after promising investors it would use actual sales prices.  This deceptive conduct resulted in the public dissemination of documents upon which investors would reasonably rely and therefore demonstrates a "close fit" with the fourth factor such that Jacoby's willful deception of Osiris's auditors and investors was in connection with the sale of securities.  Jacoby has pointed to no contrary evidence which could create a genuine dispute of material fact with respect to this issue.

*****

In sum, the SEC is entitled to summary judgment against Jacoby for violation of Rule 10b-5 with respect to the PhysioRx transaction and the second and third quarter Stryker transactions, but not the first quarter Stryker transaction and not the Medikon transaction; and the SEC is not entitled to summary judgment against Debrabandere on the 10b-5 claim as to any transaction.

## IV.    Count 4: Securities Act Section 17(a)

Courts apply practically the same tests for determining liability under Section 10(b) and Rule 10b-5 and Section 17(a).[19]  *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007) ("The

---

[18] Jacoby's claim that his act of backdating the memo could not have influenced the sale of securities because the auditors ultimately disregarded the memo is unavailing.  Unlike a private plaintiff, the SEC is not required to prove an investor relied on any omissions or misstatements or suffered loss as a result.  *See Pirate Inv'r*, 580 F.3d at 239 n. 10.  It is enough that Jacoby's actions resulted in the filing of publicly disseminated documents with material misrepresentations.

[19] Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1)  To employ any device, scheme, or artifice to defraud, or

standard for establishing a violation of Section 17(a) is essentially the same though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3).") (internal quotation marks and alterations omitted).  Scienter is required to prove a violation of Section 17(a)(1), whereas negligence is sufficient to prove a violation of Sections 17(a)(2) and 17(a)(3).  *SEC v. Shanahan*, 646 F.3d 536, 541 (8th Cir. 2011) (citing *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980)); *see also SEC v. Staples*, 55 F. Supp. 3d 831, 838 (D.S.C. 2014).  The SEC has moved for summary judgment against Jacoby on its Section 17(a)(1) and (a)(3) claims and against Debrabandere on its Section 17(a)(1), (a)(2), and (a)(3) claims.  To the extent the SEC has demonstrated it is entitled to summary judgment against Jacoby for violating Rule 10b-5, it has also met its burden with respect to the Section 17(a) claims.[20]

But the SEC's failure to demonstrate that there is no genuine dispute of material fact with respect to Debrabandere's allegedly deceptive conduct precludes summary judgment on its 17(a)(1) action against him.  In addition, the SEC has failed to show that there is no genuine dispute over whether any misstatement of revenue was the cause of Debrabandere's salary increase and bonus, precluding summary judgment on the SEC's 17(a)(2) claim.  *See SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (noting that a 17(a)(2) claim may not be maintained if a person would have earned the same fees or compensation regardless of whether a false statement was made).  Osiris's compensation policies include a host of goals, many of which do not relate to compensation.  (*See* ECF 160-26, Ex. 217 at 12–13 ("Our goal is to pay each named executive officer a base salary sufficient to

---

(2)  To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)  To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[20] The court's holding that the SEC failed to demonstrate undisputed facts establishing Jacoby's scienter with respect to the Medikon transaction leaves open the possibility for a Section 17(a)(2) or (3) violation on the basis of negligence in theory but not in practice.  Jacoby's purported reliance on Montgomery's assertion that Medikon had modified its order creates a genuine dispute as to whether Jacoby acted negligently in approving the stocking orders.

remain competitive in the market. . . . [And] we did not establish individual performance metrics as objectives for the year ending December 31, 2014. . . . [We] instead reviewed the performance of our executives . . . focus[ing] on a number of factors, including individual tasks accomplished, teamwork, leadership, and inventiveness and creativity in the area of the individual's scope of responsibility.")).

As for the 17(a)(3) claim, the SEC's argument that there is no evidence Debrabandere asked anyone to ensure that the challenged transactions were in compliance with GAAP is unavailing.  At this stage of the proceedings, the court must draw all reasonable inferences in favor of the nonmoving party and may not conclude that Debrabandere acted negligently simply because there is an absence of evidence that Debrabandere acted with reasonable care.  It is the SEC's burden to adduce undisputed evidence to show that Debrabandere's conduct was negligent.  They have not done so here. Accordingly, there is a genuine dispute of material fact with respect to the 17(a) claims against Debrabandere.

## V.      Count 6: Rule 13b2-2 of the Exchange Act

Under Rule 13b2-2 of the Exchange Act, it is unlawful for a director or officer to directly or indirectly: (1) make or cause to be made a materially false or misleading statement to an accountant in connection with; or (2) omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or (ii) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.  17 C.F.R. § 240.13b2-2.  The Fourth Circuit has not addressed whether scienter is required for a 13b2-2 claim or whether liability is premised on negligence or unreasonableness.  *See SEC v. Das*, 723 F.3d 943, 954–55 (8th Cir. 2013) (noting a circuit split and declining to adopt a scienter requirement for civil claims).  Jacoby does not contest that his criminal conviction establishes all the elements of the 13b2-2 claim, and summary judgment will be granted in favor of the SEC on this count.  (*See* ECF 167 at 47).

As to Debrabandere, as explained previously, there is a genuine dispute of material fact concerning his alleged misconduct.  Because the SEC did not establish the existence of a side agreement with Stability, a reasonable juror could conclude that Debrabandere acted reasonably in certifying to Osiris's auditors that he knew of no undisclosed side agreements.  And because the SEC did not establish that Debrabandere directed Osiris's employees to ship Medikon product it did not order, a reasonable juror could conclude that Debrabandere lacked the knowledge of deception necessary to make it careless or unreasonable for him to certify to Osiris's auditors that he had no knowledge of fraud.  Accordingly, the SEC is not entitled to summary judgment against Debrabandere on the 13b2-2 claim.

## VI.     Count 8: Rule 13a-14 of the Exchange Act

Rule 13a-14 of the Exchange Act requires a CEO or CFO to certify the accuracy of the company's public filings under the Sarbanes-Oxley Act.  Among other things, this requires certifying that, based on the officer's knowledge, "the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report[.]"  15 U.S.C. § 7241(a)(2)–(3).  It is not settled whether scienter is necessary to establish a 13a-14 violation.  *See, e.g., SEC v. Jensen*, 835 F.3d 1100, 1113 n.6 (9th Cir. 2016) (declining to decide the required mental state for a violation and noting some authority suggesting scienter not required).

In this case, the SEC relies on Jacoby's certifications as they pertain to the Medikon and Stryker revenue to establish liability.  Jacoby argues that his certifications were made based on his knowledge at the time and that there is therefore a genuine dispute of material fact concerning whether he knowingly engaged in securities fraud with respect to this revenue. (ECF 167 at 45).  But Jacoby does not adequately challenge the evidence the SEC has adduced, which  shows that he has conceded he was responsible for Osiris's financial reporting in the relevant time period (ECF 47 ¶ 16; ECF 152-39, Ex. 617, Jacoby Dep. at 21); that he was involved in the drafting and review of the financial statements (ECF 152-39, Ex. 617, Jacoby Dep. at 21); and that the financial statements contained untrue statements of fact insofar as Jacoby knew Osiris was recording revenue at its list price even though it had promised to record revenue based on Stryker's actual sales prices (ECF 152-39, Ex. 617, Jacoby Dep. at 49, 120).  Even if scienter is required to establish liability, Jacoby knew Osiris was overbooking revenue and still certified the filings.[21]

---

[21] Jacoby reserves the argument that there is no cause of action, at least against individuals, under Rule 13a-14.  (ECF 167 at 45 n.13).

As to Debrabandere, there is a genuine issue of material fact as to whether he had knowledge sufficient to make his certifications false. Accordingly, the SEC is not entitled to summary judgment against him on this claim.

## VII.   Count 10: Aiding and Abetting Osiris's Violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13

"[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of" the securities laws may also be held liable for the violation. 15 U.S.C. § 78t(e). Issuers of securities are required to file with the SEC "(1) such information and documents . . . as the [SEC] shall require" and "(2) such annual reports . . . certified if required by the rules and regulations of the [SEC] by independent public accountants, and such quarterly reports . . . as the [SEC] may prescribe." 15 U.S.C. § 78m(a). Under this authority, the SEC has promulgated enforcement regulations requiring the following: (1) an issuer must add to any required filing "such further material information . . . as may be necessary to make the required statements . . . not misleading," 17 C.F.R. § 240.12b-20; (2) an issuer "shall file an annual report . . . for each fiscal year," 17 C.F.R. 240.13a-1, in a Form 8-K, 17 C.F.R. § 240.13a-11; and (3) an issuer shall "file a quarterly report on Form 10-Q," 17 C.F.R. § 240.13a-13.

The SEC claims that Jacoby knowingly or recklessly provided substantial assistance to Osiris in violating these provisions, which is shown by Osiris's admission in its restatements of its quarter one and quarter two 10-Q forms, which Jacoby signed and certified. (ECF 152 at 37; *see also* ECF 152-10, Ex. 55 at 19). Indeed, courts have held that the purpose of a restatement is to correct errors in previously-issued financial statements. *See, e.g.*, *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("The Court finds unpersuasive Defendants' suggestion that this restatement cannot be used to establish the falsity of its earlier financial statements. . . . By definition . . . a restatement says that the prior financial statement was false.").

36

Jacoby again contends that genuine disputes of material fact exist with respect to his knowledge and intent.  (ECF 167 at 46).  The issue of scienter has already been addressed and—except with respect to the Medikon transaction—the SEC has shown that there is no genuine dispute of material fact that Jacoby knowingly engaged in this misconduct.  By engaging in the conduct described with respect to the 10b-5 claims above and then signing and certifying the quarterly reports misrepresenting the relevant transactions, Jacoby was at the very least reckless in providing substantial assistance to Osiris in committing violations for which Osiris has already been adjudged liable.  But the SEC's claim against Debrabandere fails for the same reason as its 13a-14 claim above—the SEC has not shown that Debrabandere knowingly or recklessly engaged in misconduct.

## VIII.   Count 15: Sarbanes-Oxley Act of 2002, Section 304(a)

Section 304(a) of the Sarbanes-Oxley Act of 2002 requires that if a CEO or CFO must "prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws he  . . . shall reimburse the issuer for (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the twelve-month period following the first public issuance or filing" containing the restatement; "and (2) any profits realized from the sale of securities of the issuer during that twelve-month period."  15 U.S.C. § 7243(a)(1)–(2).  The act does not require a CEO or CFO to have personally engaged in misconduct before being required to disgorge profits.  *See SEC v. Jensen*, 835 F.3d 1100, 1114–15 (9th Cir. 2016) (discussing the text and legislative history of the act).

In this case, there is no genuine dispute that Osiris filed accounting restatements due to its material non-compliance with financial reporting requirements and that Jacoby's act of booking revenue at Stryker's higher list price rather than its actual sales price constitutes misconduct.  (ECF 152-2, Ex. 1 at 9, 47; ECF 154-5, Ex. 4 at 157–58).  Nor is there any dispute that Jacoby received stock options and realized profits from the sale of Osiris securities on May 27, 2015, during the twelve-month period following the release of these statements.  (*See* ECF 152-38, Ex. 616; ECF 152-40, Ex.

618, Jacoby Adm. ¶¶ 11–13).  Thus, the SEC is entitled to summary judgment against Jacoby on its

Sarbanes-Oxley claim.

The SEC is likewise entitled to summary judgment against Debrabandere on this claim.  As the

Ninth Circuit has persuasively concluded, it is the issuer's misconduct that matters—not

Debrabandere's.  *See Jensen*, 835 F.3d at 1114.  It is undisputed that Debrabandere received a bonus

within the time period covered by the Sarbanes-Oxley Act.  (ECF 154-23, Ex. 626, Debrabandere

Adm. ¶¶ 7–8; ECF 154-17, Ex. 208).

### CONCLUSION

For the reasons discussed herein, the court will grant in part and deny in part the SEC's motion

for partial summary judgment against Jacoby and will grant in part and deny in part the SEC's motion

for partial summary judgment against Debrabandere.  The court will enter summary judgment against

Jacoby as to liability on all claims raised in the SEC's motion for partial summary judgment, except as

to the Medikon transaction and the quarter one Stryker transaction.  The court also will enter summary

judgment against Debrabandere as to liability on the Sarbanes-Oxley Section 304(a) claim but will

deny the SEC's motion for summary judgment with respect to all other claims.  Finally, the court will

deny Debrabandere's motion for leave to file a surreply.  A separate order follows.


  2/2/21                                     /S/                  
Date                                           Catherine C. Blake
                                           United States District Judge